IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2018 Session

**STATE OF TENNESSEE v. JAMIE L. WOODS**

**Appeal from the Circuit Court for Robertson County**
**No. 2016-CR-330    Jill Bartee Ayers, Judge**

———————————————

**No. M2017-01760-CCA-R3-CD**

———————————————

On April 28, 2017, the Defendant, Jamie L. Woods, entered a guilty plea to theft of property valued at more than $10,000.00 and received a three-year sentence of probation with the amount of restitution to be determined by the trial court. Following a hearing, the trial court ordered the Defendant to pay $19,442.36 in restitution at $540 per month. In this appeal, the Defendant argues that the trial court abused its discretion in determining the amount of restitution and the Defendant's ability to pay the restitution. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Roger E. Nell (on appeal), District Public Defender and Rosemary Sprague (at trial), Assistant Public Defender for the appellant, Jamie L. Woods.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; John W. Carney, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The State provided the following factual basis in support of the Defendant's guilty plea:

[I]n February 2015, [the] [Defendant] [was] declared the manager of Old Hickory Tool and Die [at] their White House office and manufacturing center. At that time, he engaged in conduct specifically in the Fall of 2015, that allowed where he would go in and the one thing he was doing, was he was taking what he termed 'loans' from the company and getting them to write him a check, stating that it was a loan, but he did not have the owner's permission and basically didn't ever repay any of this. As well, he was using company credit cards for personal business. Also using the company's fuel card for personal fuel as well. [H]e had the bookkeeper write him five vacation checks in about a three month period of time, basically ordering, hey I need a vacation check when he did not have that earned vacation time. In total, with all the acts . . . during this time frame as the manager, he took over ten thousand dollars from the company.

The sole dispute in this appeal concerns the amount of restitution owed by the Defendant to his former employer, Old Hickory Tool and Die in White House, Tennessee (hereinafter "the company"). The trial court ordered a total amount of $19,442.36 in restitution, of which the Defendant concedes that he owes $8500 in unauthorized loans and $5,608.74 in credit and debit charges.[1] The Defendant and the State further agree that he has repaid the company $4200 in restitution. The Defendant contests the remaining amount of $9500, which he contends represents independent sub-contractor work performed for the company. We will therefore limit our factual recitation to this issue.

At the August 4, 2017 restitution hearing, the office manager for the company testified that prior to the offense the Defendant was employed as a design engineer and tool maker and paid an hourly rate of $29. On February 23, 2015, the Defendant was promoted to plant manager, received an annual salary of $105,000 plus health insurance, and became her boss. The office manager explained that she paid the Defendant for sub-contracting work while he was plant manager similarly to how he was paid for the unauthorized loans and vacation checks:

> He would come into my office and ask me to write a check for contract work. He gave me the job that the work was performed on. I don't even have record of him remitting an invoice to me, which would have been proper procedure, that being as though he was my boss, I did what I was asked to do and there were three checks written.

---

[1] The Defendant points out, and the State does not dispute, that there are calculation errors in arriving at the total amount owed for the unauthorized credit/debit card charges.

The three checks were issued by the office manager to the Defendant for sub-contracting work on: (1) November 3, 2015 in the amount of $2500; (2) December 3, 2015 in the amount of $2000; and (3) December 28, 2015 in the amount of $5000. In total, the Defendant received $9500 in payments from the company for sub-contracting work while he was plant manager. The office manager did not verify the sub-contracting work with the owner of the company.

On cross-examination, the office manager confirmed that prior to the Defendant's promotion to plant manager, he performed "a lot" of sub-contracting work and submitted invoices to her for payment. She agreed that the issue at the hearing was not whether the Defendant had in fact performed the sub-contracting work while he was plant manager but rather whether the payments were included in his annual salary. She was not present during the negotiations of the Defendant's "terms and salary" for his promotion to plant manager.

The owner of the company testified in large part consistently with the testimony of the office manager. In February 2015, the Defendant was promoted to plant manager following the unexpected death of the previous manager. Before he was promoted, the Defendant worked for the company as a "designer as well as a die maker" and paid hourly. The owner could not recall if she allowed the Defendant to perform sub-contractor work before he became the plant manager, but she said it was "very possible." The Defendant gave the owner the following impression during his interview for plant manager:

> My previous plant manager was at a salary of [$83,440] and when my son and I talked to [the Defendant], he wanted a much higher salary and at the time, I couldn't justify it, but in speaking with him, he said look at it this way. You have three people at this salary. You have a plant manager, you have a designer and you also have a die maker. So, he was skilled in the die making and the designing.

Asked if there was a discussion about the Defendant's "contract work" or if the Defendant would be paid for his design work while he was plant manager, the owner replied, "No, that was part of his job description." The owner agreed to pay the Defendant $25,000 more than the previous plant manager with the understanding that the Defendant's design work would be included in his salary. The owner testified that she did not authorize the three checks issued to the Defendant for sub-contractor work. On cross-examination, the owner agreed that there was no written contract with the terms of the Defendant's employment as the plant manager. When confronted with the fact that the Defendant made more money the year before he became plant manager, the owner explained that the Defendant worked overtime and "was pulling in some money."

3

The Defendant testified and disputed the company owner's understanding of his job description and salary as a plant manager. He stated,

[T]he previous plant manager, he only worked seven hours a day, thirty-five hours a week, making eighty – he did make ninety something thousand and then he cut it down to like eighty something you know, prior to him passing away. No other plant manager currently or in the past has ever had to do design work also or go be a tool maker or anything like that. And also, they didn't have the software to do the work. I owned the software myself. They didn't even have the ability there to do the work besides my software.…

[T]hat was not my understanding whatsoever because the whole thing – the only thing I asked for is what I took at that I would make what I made the previous year. That's the only thing on the salary that I asked, and had the same exact perks [of the prior manager].

The Defendant provided his 2014 W-2, admitted as an exhibit, showing that he made $108,652 the year before he became plant manager. He insisted that he would not have accepted the promotion to plant manager for less money than he made the previous year. He further testified that while he was plant manager, he worked 80 to 100 hours a week.

The presentence report, admitted as an exhibit, showed the Defendant with the following debts:

| Utilities (Monthly) | $980 |
| Phone/Internet (Monthly) | $564 |
| Chapter 13 Bankruptcy | $32,000 |
| Car Insurance (Monthly) | $158 |

The Defendant elaborated on the above monthly expenses during his testimony at the hearing, detailed in the below chart:

| Electric | $225-$250 |
| Water | $125-$150 |
| Internet | $128 |
| Cell Phone | $442 |
| Dental | $100 |
| Car Insurance | $614 (every 3 months) |
| Hospital Bills | $557 (remaining balance) |

4

| Bankruptcy | $108 (weekly) |
| --- | --- |
| Food | $600-800 |
| Gas | $50 (weekly) |
| Rent | $800 |

At the time of the hearing, the Defendant was employed, making $25.00 an hour, and sought overtime when possible. He testified that he lived with his girlfriend with whom he shared one child. Three teenage children also lived in the home permanently and one smaller child lived there every other week. His girlfriend did not work or assist him with the bills.

At the close of the hearing, the trial court ordered the Defendant to pay $19,442.36 for a three-year period in monthly payments of $540. In doing so, the trial court reasoned as follows:

> The contract pay is a disputed issue. The total amount of those was nine thousand five hundred dollars. The Court takes into account the testimony of [the owner] about when they were negotiating the pay. Also, the pay as plant manager, and then the previous plant manager's payment was substantially less. One of the things that I heard several folks talk about is that typically that contract work, there were invoices submitted and they would have been paid. There were not invoices that the Court has to consider. [The office manager] indicated that she received no invoices for those. The Court finds that in light of the salary that . . . the defendant was making and the fact that there are no invoices, I am going to award nine thousand five hundred dollars in restitution. . . .

> So that total is twenty-three thousand, six forty-two, thirty-six. It is undisputed that three thousand two hundred dollars was paid by the fifty dollar a month deduction and then another one thousand was paid by the Defendant. And so, that should leave our total at nineteen thousand, four forty-two, thirty-six.

> I will just comment on – that is the amount that the Court is going to award. There has been testimony about his ability to pay. He's got good income. I find some of those bills to be kind of excessive and over the top in choices that he has made when he took money from this company that he admitted to, and pled guilty on and so considering all those issues of his ability to pay, I find that to be a reasonable number that can be paid in this three year term. Thank you.

5

It is from this order that the Defendant now appeals.

## ANALYSIS

The Defendant argues that the trial court abused its discretion in determining the pecuniary loss and in determining his ability to pay restitution. The State argues, and we agree, that the evidence at the restitution hearing supports the trial court's restitution order.

We review a trial court's restitution order for an abuse of discretion, granting a presumption of reasonableness to within range sentences reflecting a proper application of the purposes and principles of the Sentencing Act. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012); State v. King, 432 S.W.3d 316 (Tenn. 2014); Tenn. Code Ann. § 40-35-104(c)(2) (restitution is authorized by the statute governing alternative sentences). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010). While there is no set formula for determining restitution, State v. Johnson, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997), above all, the restitution amount must be reasonable. State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). When ordering restitution, the trial court must base the amount on the pecuniary loss to the victim. Tenn. Code Ann. § 40-35-304(b); Smith, 898 S.W.2d at 747. "Pecuniary loss" is statutorily defined as "[a]ll special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant." Tenn. Code Ann. §40-35-304(e)(1); State v. David Allan Bohanon, No. M2012-02366-CCA-R3CD, 2013 WL 5777254, at *6 (Tenn. Crim. App. Oct. 25, 2013). Moreover, "[i]n determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d); State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). This is because "[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." Johnson, 968 S.W.2d at 886.

Here, the Defendant contends that the trial court erred by including the sub-contracting work in the pecuniary loss. He essentially argues that this work was not contemplated as part of his plant manager job description or salary; therefore, he does not owe the company money for the work performed. In contrast to the Defendant's position, the record shows that the company owner promoted the Defendant to plant manager with the understanding that his design work would be included in his salary. The company owner paid the Defendant $25,000 more than the prior plant manager based on her belief that the Defendant would serve three roles: a plant manager, a designer, and a die maker. By its ruling, the trial court implicitly accredited the testimony of the company owner

6

over that of the Defendant. Moreover, the trial court emphasized that the Defendant's sub-contracting work prior to becoming plant manager was supported by invoices to the company. Significantly, after he was promoted to plant manager, the Defendant failed to provide the company with any invoices for his sub-contracting work. Based on this evidence, the trial court properly determined that $9500 in sub-contracting work should be included in the company's pecuniary loss. The Defendant is not entitled to relief on this issue.

The Defendant next contends that the trial court abused its discretion in ordering an amount of restitution that exceeded his ability to pay. Specifically, the Defendant argues that the State failed to prove his ability to pay $540 per month and requests this court to modify the restitution order in the amount of $200 per month, with the remaining amount to be converted to a civil judgment. While we acknowledge, as argued by the Defendant, that the State carries the burden of proving facts relevant to sentencing by a preponderance of the evidence, see State v. Russell E. Mills, No. M1999-2505-CCA-R3-CD, 2000 WL 1336685, at *4 (Tenn. Crim. App. Sept. 15, 2000); State v. Carlton Horton, No. E2010-02146-CCA-R3-CD, 2011 WL 2084001, at *4-5 (Tenn. Crim. App. May 19, 2011), the burden of demonstrating the impropriety of a sentence falls on the defendant. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmt.; State v. Jennifer Murray Jewell, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *5 (Tenn. Crim. App. Jan. 6, 2017). An alternative sentence, as granted in this case, includes an order of restitution.

Here, the Defendant received a three-year probationary sentence, and the trial court ordered him to pay $540 per month to satisfy $19,442.36 in restitution owed. The presentence report showed that the Defendant was in excellent physical and mental health, gainfully employed, and made $25 an hour. The Defendant stated that he worked overtime when possible, and at the hearing, the office manager and the company owner affirmed the Defendant's work ethic and his ability to "pull in a lot of money" based on overtime. His ability to earn money based on overtime was buttressed by the fact that he made $108,652 the year before he became plant manager. Although he testified that he was not currently performing design work, he owned the software to do this work for his former employer when necessary. In any event, assuming the Defendant works 40 hours a week, he earns a minimum of $52,000 a year or $4333 per month. The Defendant's debts and assets as described in the pre-sentence report and through his testimony at the hearing show his expenses as approximately $3320 per month. While we acknowledge that the Defendant's collective debts leave little room for any other family obligations he may have, the record shows that the trial court considered his financial resources and ability to pay as required by statute. Because the trial court properly exercised its discretion in determining the Defendant's ability to pay the restitution amount, he is not entitled to relief.

7

## CONCLUSION

As previously noted, there are calculation errors in the amount of restitution owed for the undisputed credit card charges. While the proof showed an amount of $5,608.74, the trial court's calculation of the same reflects $5,642.36, resulting in a difference of $33.62. As such, a remand is necessary for entry of a corrected order reflecting the proper amount of restitution owed. In all other respects, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE